```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                     HOUSTON DIVISION

RICHARD A. WASSON,              §
                                §
      Plaintiff                 §
                                §
v.                              §      CIVIL ACTION NO. H-05-4250
                                §
MARITIME ASSOCIATION I.L.A.     §
PENSION FUND,                   §
                                §
      Defendant.                §
```

MEMORANDUM AND ORDER

Pending are Plaintiff Richard A. Wasson's Motion for Summary Judgment (Document No. 23), and Defendant Maritime Association I.L.A. Pension Fund's cross Motion for Summary Judgment (Document No. 25). After carefully considering the motions, responses, reply, and the applicable law, the Court concludes as follows.

I. Background

This is an ERISA case arising from a denial of benefits to Plaintiff Richard A. Wasson ("Plaintiff"), a longshoreman and participant in Defendant Maritime Association-I.L.A. Pension Fund ("Defendant"), a defined benefit plan ("Plan") under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The named fiduciary and administrator of the Plan is a sixteen-member Board of Trustees (the "Trustees") comprised in equal part of union and management representatives. Because the

Plan was frozen in December, 1996, there have been no new accruals to the Plan since that date. Document No. 23 app. at 105. However, vested benefits under the Plan remain in effect. Id.

Plaintiff was a longshoreman from 1967 until November 20, 1990, when, while on the job, he was struck in the head while lashing containers aboard a ship. He received workers' compensation payments for his injuries from November 21, 1990 to February, 2001. Document No. 24 app. at 10. Plaintiff did not apply for disability pension, based on his belief that he was not totally and permanently disabled by the injury, Document No. 25 ex. 1 at 44-45, and because the payments, if any, would be offset almost entirely by the workers' compensation, Document No. 27 ex. 1 § 6.2(d). At the time of the accident, Plaintiff was 41 years old and had accrued 23 years of "Continuous Service" as defined in the Plan.

Plaintiff's physicians released him to work on December 10, 1990, but, due to the lingering effects of the accident, advised that he not perform activities that required a fine degree of balance. Document No. 25 ex. 1 at 173. Hence, Plaintiff never returned to work as a longshoreman or any other employment covered by the Plan and he continued to receive workers' compensation benefits for at least five years. Plaintiff went to college, received a degree in business, obtained employment as a corporate

trust officer with Chase Bank, and then left that position in 2006 to pursue other interests.

<u>Relevant Plan Language</u>

Under the Plan, a Participant's "Continuous Service" ends when a Participant dies, becomes entitled to an Age or Disability Pension, or during "the second Year of a period of three consecutive Years for each of which the Participant is credited with less than 400 Credit Hours."  Document No. 1 ex. 3-F § 3.2. "Credit Hours" are based on "Hours of Service," hours for which the employee is paid directly or indirectly or that are credited to him under certain circumstances, including absence due to military service, injury incurred off or on the job, and wartime catastrophes.  <u>Id.</u> exs. 3-C to 3-E, §§ 3.1(a)-(d).  Specifically, Section 3.1(c) provides:

> if an *Active Participant ceased or ceases to be an Employee* for any of the reasons set forth in the following Paragraphs (a), (b), (c) or (d), he *shall be credited with Credit Hours pursuant to the following Paragraphs (a), (b), (c) and (d)* . . . .
>
> . . . .
>
> (c)  **Injury Incurred on the Job**
>
> > If such a Participant incurs a compensable injury on the job while working as an Employee for an Employer *for which he is not eligible for a Disability Pension*, during the period of such injury such Participant *shall be credited at the rate of 400 Credit Hours per*

> *year* . . . for such time as he is disabled
> from working in the industry due to injury or
> during the time he is receiving compensation
> payments, whichever period is the shorter, but
> in no event to exceed *five years*.   For
> purposes of this Paragraph (c), a compensable
> injury means an injury for which a Participant
> is entitled to receive Worker's Compensation
> benefits under either Federal or State
> compensation laws . . . .

Id. exs. 3-D, 3-E § 3.1(c) (emphasis added).  The 400 Credit Hours

provided in Section 3.1(c) complement the "Break in Service"

provision, which states:

> An Active Participant shall incur a Break in Service as
> of the later of (i) or (ii):
>
> > (i) the last day of the second Year of a
> > period of three consecutive Years during each
> > of which the Participant has been credited
> > with *less than 400 Credit Hours*;
> >
> > (ii) the last day of the Year preceding the
> > first Year in which the Participant's Total
> > Hours is less than 500 . . . .

Id. ex. 3-G § 3.5 (emphasis added).

As indicated in the prefatory language to Section 3.1(c), to

qualify for the injury credit, one must be an "Active Participant"

in the Plan.   Id. ex. 3-D.   The Plan defines an "Active

Participant" as "any person who has become an Active Participant in

accordance with Section 4 . . . or who [after a Break in Service]

has again become an Active Participant in accordance with Section 9

. . . ." Id. ex. 3-B § 2.1.  It is undisputed that, at the time he

4

was injured, Plaintiff was an "Active Participant" as provided in Section 4.1, which states in relevant part that "[e]ach Employee who would have been an Active Participant on October 1, 1980 in the Plan as in effect on September 30, 1980 shall be an Active Participant in the Plan on October 1, 1980." Id. ex. 3-I § 4.1. Alternatively, Section 9.2 provides for reinstatement as an Active Participant after a Break in Service:

### Reemployment After Interruption of Service

If an *Active Participant incurs a Break in Service* on or after October 1, 1976, and before he is eligible for an Age or Disability Pension, *he may regain his status* as an Active Participant *provided he subsequently satisfies the participant requirements set forth in Subsection 4.2*. . . . . If a former Active Participant who has incurred a Break in Service subsequently regains his status as an Active Participant, . . . the Continuous, Credited, and Vesting Service he had been credited with prior to his Break in Service shall be restored and included in the determination of his Continuous, Credited, and Vesting Service on his subsequent retirement, death, or Break in Service . . . .

. . . .

A One Year *Break in Service* shall be any Year following the date of a Participant's Break in Service during which (i) he is credited with less than 400 Credit Hours and (ii) his Total Hours is less than 500 . . . .

Document No. 23 app. at 28 § 9.2 (emphasis added). The pertinent portion of Section 4.2 states that an Employee "shall become an Active Participant" on the "first day of the Year following the

first Year in which he is credited with at least 1,000 Credit Hours
. . . ."  Document No. 1 ex. 3-I § 4.2.

<u>Administrative Determination</u>

In 1995, Defendant informed Plaintiff that he had accrued 25
years of Continuous Service and would be eligible to receive
benefits under the Plan upon reaching age 55.  Defendant's
calculation was based on the 23 years of continuous service at the
time of Plaintiff's injury, plus an additional credit of two years
at which time Defendant, by denying to Plaintiff 400 Credit Hours
each year, determined Plaintiff had a Break in Service.  Document
No. 1 ex. 1-A.  Sometime thereafter, Plaintiff sought a
determination by Defendant as to his eligibility for an "Age
Pension" for employees with 30 or more years of "Continuous
Service," also known as a "thirty and out" benefit.  <u>Id.</u> exs. 1-H,
1-N.  Specifically, Plaintiff asserted he was entitled under
Section 3.1(c) of the Plan to 400 Credit Hours each year for the
first five years after his departure from employment due to an
injury for which he received workers' compensation, plus two years'
credit under Section 3.5(i), for a total of 30 years before his
Break in Service.

After a meeting on December 15, 2004, the Trustees issued an
"Adverse Benefit Determination" informing Plaintiff of its decision
to deny Plaintiff the credit, and hence, the "thirty and out"

6

benefit, based on its determinations respecting Section 3.1(c) of the Plan:

> 1.    In order to receive disability service crediting under the Plan, a participant must return to the industry and work 1000 hours.
>
> 2.    Disability service crediting under the Plan, when applicable, runs for five years from inception of disability.
>
> 3.    Disability service crediting under the Plan can be negated due to a participant being "eligible for a Disability Pension," even though the participant has not applied for or been approved for such Disability Pension.

Id. ex. 1-O.   In January, 2005, Defendant commenced paying Plaintiff "Vested Benefits" based on 25 years of "Continuous Service."  Id. ex. 1-P.

Plaintiff appealed the decision.   Prior to the final hearing on March 15, 2005, the Trustees were provided Plaintiff's medical documentation and prior correspondence.  Id. ex. 1-Q.  According to Plaintiff, he "spent about three-quarters of [his] appeal trying to explain how [he] was not totally and permanently disabled," which he believed to be the only obstacle to obtaining a five-year injury credit.  Document No. 26 ex. 1 at 26-27.  However, the Trustees on March 24, 2005, affirmed their denial of the § 3.1(c) injury credit based in pertinent part on their "consistent policy and interpretation" of this provision "to require a return to the industry and 1,000 hours of work in order to receive credit for the period of time disabled from working in the industry due to injury

7

incurred on the job." Document No. 1 ex. 1-R. The Trustees also explained that the period of injury credit "is _offset_ by the period of time for which he is _eligible_ for a [D]isability Pension, even though he may not have applied for or been approved for such Disability Pension." _Id._ ex. 1-S (emphasis in original). However, the Trustees did not "deem[ ] it necessary to make a determination as to the application of this offset," relying instead on their other grounds for denial.[1]   _Id._

Plaintiff filed suit under ERISA sections 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), to recover the Plan's "thirty and out" pension. In their cross-motions for summary judgment, the parties dispute two central issues: (1) whether the Trustees abused their discretion in denying Plaintiff a five-year injury credit under § 3.1(c) and, hence, a pension based on thirty years of Continuous Service, based on their interpretation of § 3.1(c) to require an employee to return to work for 1,000 hours; and (2) whether receipt of injury credit under § 3.1(c) is conditioned on Plaintiff's applying for and being denied eligibility for a Disability Pension and, since he did not do so,

---

[1] The Trustees additionally justified denial of the "thirty and out" pension based on their interpretation of the five-year service credit under § 3.1 to "subsume[ ] any credit available" for Break in Service pursuant to § 3.5(i), thereby disallowing an employee to receive credit under both provisions.  Document No. 1 ex. 1-S. However, this rationale is not raised in Defendant's summary judgment briefing as a basis for denying to Plaintiff the additional five-year service credit under § 3.1(c), and it is therefore abandoned.

whether Plaintiff is precluded from recovery based on the injury credit.

## II.   Discussion

### A.   Standard of review under ERISA

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 109 S. Ct. 948, 956-57 (1989).  The Plan in this case vests the Trustees with "discre-tionary authority to make necessary benefits eligibility determinations and to interpret Plan rules, regulations, and provisions in accordance with the provisions of the Plan and Trust."  Document No. 25 ex. 2 § 13.1.  Moreover, the parties' dispute pertains to the proper interpretation of Plan provisions. Thus, the Court will review the Trustees' determination under an abuse of discretion standard.  *See* Chacko v. Sabre, Inc., 473 F.3d 604, 610 (5th Cir. 2006); Gosselink v. Am. Tel. & Tel., Inc., 272 F.3d 722, 726 (5th Cir. 2001).

When evaluating whether the Trustees abused their discretion, the court must first determine the legally correct interpretation of the Plan.  *See* Vercher v. Alexander & Alexander Inc., 379 F.3d 222, 227 (5th Cir. 2004).  In doing so, the court must consider:

"(1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan." Chacko, 473 F.3d at 611; Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 344 (5th Cir. 2002) (citing Gosselink, 272 F.3d at 726). "If [the court] determine[s] that the fiduciary's interpretation of the plan was legally correct, the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 270 (5th Cir. 2004); *accord* Vercher, 379 F.3d at 227. Otherwise, the court must weigh the following factors to determine whether the decision was an abuse of discretion: (1) the internal consistency of plan provisions under the fiduciary's interpretation; (2) any relevant administrative regulations; and (3) the factual background to the determination and evidence of bad faith, if any. *See* Ellis, 394 F.3d at 272 n.23.

B.   Analysis of the Trustee's Interpretation

The parties dispute whether Plaintiff, as an employee who separated from covered employment due to a compensable on-the-job

injury,[2] is entitled under the Plan to a credit of five years toward his years of "Continuous Service."[3]  If granted, these extra years, coupled with his undisputed 23 years of Continuous Service prior to the injury and a final two-year Break in Service credit under the Plan, would entitle Plaintiff to an Age Pension available to employees with 30 years of Continuous Service instead of the lesser benefits he received for 25 years of service.[4]

_____

[2] It is uncontroverted that Plaintiff qualified for and received workers' compensation benefits throughout the five-year period following his injury, and thus suffered a compensable injury.

[3] Plaintiff submits the testimony of its expert, Francis X. Gowen ("Gowen"), who asserts that Defendant adopted an incorrect interpretation of the Plan.  *See* Document No. 24 app. at 30-33, 34-58.  However, this testimony consists entirely of inadmissible legal conclusions.  *See, e.g.*, Owen v. Kerr-McGee Corp., 698 F.2d 236, 204 (5th Cir. 1983)(cautioning that although FED. R. EVID. 704 allows expert testimony regarding ultimate questions of fact, it is not "intended to allow a witness to give *legal* conclusions") (emphasis in original); Drain v. Galveston County, 999 F. Supp. 929, 933 n.3 (S.D. Tex. Mar. 30, 1998)(Kent, J.)("[A]s any 'expert' in the law should be well aware, expert testimony is allowed only to help the trier of fact determine *facts* in issue, not legal issues.")(emphasis in original).  Accordingly, Gowen's testimony is not competent summary judgment evidence and is disregarded.

[4] Although Plaintiff refers to the pension granted to him by Defendant as a "Vested Pension," it appears instead that Defendant deemed him eligible for an "Age Pension" for participants who "attained age 55 and completed 25 or more years of Continuous Service . . . ."  Document No. 1 ex. 3-J § 5.1(c); *see also* id. ex. 3-P § 8.1 (listing the requirements for a "vested pension" as, *inter alia*, attainment of age 50 and accrual of at least 25 years of Continuous Service); Document No. 25 at 9 (referring to Plaintiff's receipt of a "25 year pension" upon attainment of age 55).

1.   Legal Correctness

The second of the three factors will initially be considered--
whether the Trustees' interpretation of the Plan is fair and
reasonable.[5]   "Eligibility for benefits under any ERISA plan is
governed in the first instance by the plain meaning of the plan
language."   Threadgill v. Prudential Sec. Group, Inc., 145 F.3d
286, 292 (5th Cir. 1998).   The terms of an ERISA plan must be
construed as they are likely to be "understood by the average plan
participant . . . ."   Walker v. Wal-Mart Stores, Inc., 159 F.3d
938, 940-41 (5th Cir. 1998)(per curiam); see also Tucker v. Shreve-
port Transit Mgmt. Inc., 226 F.3d 394, 398 (5th Cir. 2000)
(explaining that plans should be interpreted as they would by one
of "average intelligence and experience").

Defendant contends that Plaintiff's status as an "Active
Participant" expired upon the occurrence of a Break in Service two
years after his injury and, because Plaintiff did not subsequently
return to employment in the industry for a minimum of 1,000 hours
in a given year as specified in § 9.2 and § 4.2, he did not again
become an "Active Participant" entitled to up to the five years of
Credit Hours under § 3.1(c).   Defendant's interpretation of
§ 3.1(c) rests on an erroneous assumption that the § 3.1(c) injury

---

[5] Because neither party has submitted a complete copy of the
Plan, the Court's analysis necessarily is based on Plan excerpts
contained in the summary judgment record.

credit depends on an employee's "Active Participant" status not when he was injured, but at some later date *after* he returns to work for at least 1,000 hours and *regains* status as an Active Participant.  Section 3.1(c), however, does not so require. Reading § 3.1(c) in context with its prefatory language, it states that "if an Active Participant *ceased or ceases to be an Employee*" because of, *inter alia*, a compensable injury incurred on the job, "he *shall be credited*" at the rate of 400 Credit Hours per year for such time as he is disabled from working in the industry for up to five years.  Document No. 1 ex. 3-D (emphasis added).  Because he was undisputedly an Active Participant at the time of his compensable injury, § 3.1(c) required that he be credited at the rate of 400 Credit Hours per year while disabled from working, for up to five years, and those Credit Hours counted toward his Continuous Service under § 3.2 and were sufficient to avoid a Break in Service under § 3.5.[6]

Moreover, of the special credit provisions within § 3.1, the only one that expressly requires a return to work is § 3.1(a), which states that a Participant who enters the Armed Forces of the

---

[6] It is also notable that the Plan provides that an "Age Pension" is likewise available only to an "Active Participant." Document No. 1 ex. 3-J § 5.1.  Thus, Defendant's rationale that an "Active Participant" is one who regains such status after a departure from employment would also disqualify Plaintiff even for an Age Pension, a result that is inconsistent with Defendant's own determination that Plaintiff is in fact eligible for an Age Pension, albeit one based on 25 rather than 30 years of Continuous Service.

United States must "return[ ] to employment in the industry as an Employee within 90 days . . . of his release or discharge from active duty" in order to receive Credit Hours for the period of his absence.  Id. ex. 3-D § 3.1(a).  Defendant's assertion that the Plan includes this language in subsection (a) to comply with the Uniformed Services Employment and Reemployment Act ("USERA"), 38 U.S.C. § 4301, et seq., only reinforces that the return-to-work obligation included within that subsection is specific to military service persons and was not intended to apply to a parallel provision without such a requirement.  Stated differently, the absence of a return-to-work requirement in § 3.1(c) does not evidence ambiguity, but instead--and in clear contrast to what is expressly required in § 3.1(a)--manifests an intent not to require a return to work.[7]  Defendant's assertion that the 400 Credit Hours provided in § 3.1(c) are available only to those employees who return to work for an additional 1,000 hours following their absence is unsupported by a plain reading of § 3.1(c), and is inconsistent with the overall structure of § 3.1.

By construing Plaintiff's absence from employment during the second year following his injury as a Break in Service that

---

[7] Section 3.1(a), moreover, awards the veteran who returns to work with 1,000 Credit Hours for each of the first three consecutive years of his military service, whereas an injured worker accrues a maximum of only 400 Credit Hours per year, for up to a maximum of five years, a significant disparity that also may help explain why there is no requirement for an injured Participant to return to work.

terminated Plaintiff's accrual of Continuous Service, Defendant obviously refuses to count Plaintiff's § 3.1(c) 400 Credit Hours per year provided under § 3.1(c). However, when the Credit Hours granted pursuant to § 3.1 are not to be counted, the Plan expressly so states. For example, in calculating a Participant's "Vesting Service," the Plan states that "Credit Hours credited pursuant to Paragraphs (b), (c) and (d) of Subsection 3.1 shall be excluded from the Participant's Credit Hours." Id. exs. 3-F, 3-G § 3.4. In contrast, the Plan does not exclude them from being counted in the Break in Service provisions of Sections 9.2 and 3.5, and does not authorize their exclusion when calculating a Participant's years of Continuous Service under § 3.2.[8] *See* id. exs. 3-F § 3.2, 3-G § 3.5; Document No. 23 app. at 28 § 9.2. Because the Plan elsewhere expressly specifies when § 3.1 Credit Hours are to be excluded, the absence of such a requirement to exclude § 3.1(c) Credit Hours when determining whether a Break in Service has occurred, and when calculating a Participant's Continuous Service, reinforces the conclusion that the Plan requires those hours to be counted.

_____

[8] Furthermore, nothing in § 9.2 evidences an intent to override the mandatory language in § 3.1(c), obligating Defendant to grant the 400 Credit Hours, by allowing the Trustees *first* to apply the Break in Service criteria *before* considering his eligibility for the Credit Hours under § 3.1(c). In fact, the evident (and limited) purpose of § 9.2 is to preserve a Participant's ability to aggregate Continuous, Vesting, or Credit Service accrued both before and after a Break in Service, if one should occur.

Indeed, the 400 Credit Hours proviso under § 3.1(c) dovetails precisely with the minimum 400 Credit Hours needed both to prevent the occurrence of a Break in Service under § 3.5, which is reiterated in § 9.2, and to maintain a Participant's years of Continuous Service under § 3.2.  The interrelationship between these provisions evidences that § 3.1(c): (1) preserves an Active Participant's status for up to five years following his departure due to an injury on the job by providing the minimum 400 Credit Hours each year necessary to maintain such status; (2) entitles such a participant for up to five years of credit at 400 Credit Hours a year toward his years of Continuous Service; and (3) forestalls the occurrence of a Break in Service (and the end of a participant's Continuous Service) until the second year after the five-year period ends (i.e., the second year in which the participant no longer accrues at least 400 Credit Hours). Defendant therefore thwarted the purposes of § 3.1(c) by construing Plaintiff's absence as a Break in Service without first crediting Plaintiff with the hours provided under § 3.1(c).  Defendant's denial to Plaintiff of five years of credit toward his Continuous Service based on his failure to return to work conflicts with the plain and unambiguous language of § 3.1(c), is inconsistent with the design and interrelationships of the relevant provisions, and is an unreasonable and unfair interpretation of the Plan.

2.   Uniformity of Interpretation

The next question is whether the Trustees have uniformly required an employee in circumstances such as Plaintiff's to return to work before qualifying for the five-year injury credit.   *See* Gosselink, 272 F.3d at 727 (concluding that the undisputed fact of the administrator's consistent interpretation of the provision at issue weighs in favor of finding it legally correct).   Defendant asserts that over the 50-year history of the Plan, "the Trustees have consistently required that a participant who incurs a break-in-service before being eligible for an age pension . . . and who seeks an injury on the job credit under § 3.1(c) must return to the industry for 1,000 hours . . . ."   Document No. 25 at 17; *see also* id. ex. 3 ¶ 3.   In spite of this broad proclamation, Defendant's expert, Scott C. Sustman, identifies only a handful of cases that arguably support Defendant's interpretation of the injury credit: (1) "five participants who had missed years of work due to injury on the job, but had returned to the industry and had worked 1000 hours in at least one year after their period of absence," received up to five years of credit towards their Continuous Service; (2) "five participants who are receiving age pensions who did not return to work after an injury" qualified for age pensions without the injury credit; and (3) seven participants who are absent due to injury and have not yet returned to work, "but are of an age where they may still return to work."   Id. ex. 7 ¶¶ 5-7.   Defendant's

17

treatment of the last two of these groups is irrelevant, because the participants in the former group qualified for age pensions without regard to the application of § 3.1(c), and in the latter group no final determination regarding the applicability of the injury credit has been made. As for the first group of participants, granting of credit to employees who returned to work following injury is consistent with Defendant's assertion that receipt of the credit is contingent upon a return to work. However, it is also consistent with Plaintiff's assertion--and the Court's conclusion--that it is the occurrence of a compensable on-the-job-injury, and not a return to work, that entitles an Active Participant to up to five years of injury credit. Stated differently, Defendant's treatment of these five participants does not demonstrate that the injury credit is *unavailable* to an employee similarly-situated to Plaintiff, who seeks credit under § 3.1(c) but who did not return to work in the industry. The summary judgment evidence therefore provides scant support for the existence of a long-standing practice to which the Trustees allegedly adhered when they denied Plaintiff credit under § 3.1(c). The bottom line is that there is no evidence of an employee similarly-situated to Plaintiff either being denied credit or

18

granted credit under § 3.1(c) after applying for such credit and never returning to work in the industry.[9]

### 3.   Unanticipated Costs

Finally, consideration must be given to whether either interpretation would give rise to substantial unanticipated costs to the Plan.  *See* Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1520 (5th Cir. 1994); Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension & Ret. Fund, 877 F.2d 441, 444 (5th Cir. 1989). "If a given interpretation would result in such costs, that interpretation is less likely to be legally correct." Batchelor, 877 F.2d at 445.  These costs, if any, are measured as a proportion of the Plan's total assets.  Id.

Defendant's expert, William Clay Holloway ("Holloway"), estimates that adoption of Plaintiff's interpretation of § 3.1(c) would cost the Plan $9.6 million, thus increasing its $400 million in outstanding liabilities by 2.4%.  Document No. 25 ex. 4 ¶¶ 6-7. This figure is based on adjusted benefits calculations for 160 "disabled retirees" who are currently receiving Disability Pensions, and who allegedly would be entitled to all or part of the

---

[9]  Defendant's Chairman Charles A. Alcorn states in his Declaration that the Trustees have never granted the credit where the participant failed to return to work in the industry for 1,000 hours, but again, he does not declare that the Trustees ever received and acted upon an application of any named individual to receive such credit without returning to work for 1,000 hours.  *See* Document No. 25 ex. 3 ¶ 3.

maximum five-year credit under § 3.1(c) to compensate them for the
period between the time they left work due to injury and the
commencement of their Disability Pensions.  Document No. 25 ex. 4
¶¶ 3-5.  Section 3.1(c) expressly denies Credit Hours to an injured
Participant who is eligible for Disability Pension.  Defendant
contends that, under Plaintiff's interpretation of the Plan, the
absence of evidence that these disabled retirees were eligible for
Disability Pension *before* they began receiving it entitles them to
the injury credit during this period.  Document No. 28 at 4.
Defendant therefore assumes that Participants deemed eligible for
Disability Pension may not have been so eligible when they left
employment due to an on-the-job injury.  However, to qualify for
Disability Pension, a Participant must not only have become
permanently and totally disabled, but must also have been "*employed
in the industry* at the time he bec[ame] totally and permanently
disabled."  Document No. 1 ex. 3-K §§ 5.2(b)(2), (c)(3) (emphasis
added).  Thus, the Plan itself forecloses the possibility that a
Participant who left employment due to injury and later applied for
and received Disability Pension would not have qualified for the
pension when he separated from employment due to the injury.  The
Trustees' determination that these retirees were eligible for
Disability Pensions necessarily confirms that they were employed in
the industry when they suffered injury totally and permanently
disabling them.  Hence, the Plan allows for no "gap" period in

which a totally and permanently disabled Participant could qualify
for § 3.1(c) Credit Hours.  In other words, Defendant's alleged
unanticipated costs under Plaintiff's construction of § 3.1(c) are
precluded by the plain language of the Plan.

Moreover, even assuming that these "disabled retirees" could
qualify for credit under Plaintiff's interpretation of § 3.1(c),
the increased costs claimed by Defendant of only 2.4% of the Plan's
liabilities proportionately are not so substantial or significant
as to warrant the Trustees' patently erroneous interpretation that
the Plan imposes a return-to-work requirement.  As discussed above,
the "most important factor," that of the Trustees' interpretation
of the Plan, Gosselink, 272 F.3d at 727, weighs strongly against
Defendant, and Defendant presents only the most tenuous of evidence
supporting the uniformity of its interpretation in a circumstance
such as Plaintiff's.  Accordingly, the Court concludes that the
Trustees' interpretation is legally incorrect.

C.   Abuse of Discretion

Having found that the Trustees' interpretation is legally
incorrect, the Court must consider whether they abused their
discretion in denying Plaintiff the five-year service credit
provided under § 3.1(c).  It is apparent that the denial was
predicated almost entirely on the Trustees' allegedly consistent
practice of granting § 3.1(c) credit only to those employees who

returned to work for 1,000 hours, in spite of the fact that Defendant's own expert was able to identify very few cases in which § 3.1(c) was even arguably applied, and none--such as in Plaintiff's circumstance--where the employee did not return to work in the industry.  The Trustees' desire to maintain consistency with a prior interpretation is not arbitrary in and of itself, but where such an interpretation is void *ab initio*, its mere repetition and perpetuation does not mitigate the error.  *See, e.g.*, Dennard v. Richards Group, Inc., 681 F.2d 306, 318 (5th Cir. 1982) ("[I]f the interpretation is unreasonable from the beginning, such an interpretation may still be arbitrary and capricious.") (quoting Morgan v. Mullins, 643 F.2d 1320, 1324 n.4 (8th Cir. 1981)); id. ("Being consistently wrong can hardly be sanctioned as right.") (quoting Snyder v. Titus, 513 F. Supp. 926, 934 (D. Va. 1981)).

"If an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused its discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." Gosselink, 272 F.3d at 727.  This approach avoids the "anomalous finding that a Plan administrator's interpretation which directly violates the plain meaning of the plan language is not an abuse of discretion simply because the plan language has always been interpreted in the same manner and there are no inferences of bad faith." Id.; *see also* Baker v. Metro.

Life Ins. Co., 364 F.3d 624, 633 (5th Cir. 2004)(Wiener, J., concurring).   As discussed above, the wording of § 3.1(c) and its interrelationship with other Plan provisions clearly and unambiguously entitles an employee who leaves employment because of a compensable on-the-job injury to receive up to five years of service credit without regard to whether such employee returned to work following his absence.   Thus, by denying Plaintiff injury credit because of his failure to return to work after qualifying for an age pension, the Trustees improperly added an *entirely new requirement* to § 3.1(c).   *See, e.g.*, Epright v. Envtl. Res. Mgmt, Inc. Health & Welfare Plan, 81 F.3d 335, 342 (3d Cir. 1996)(agreeing with Morgan, 643 F.2d at 1321, that imposing requirements not contained in a plan constitutes arbitrary conduct).   The return-to-work requirement found in other Plan provisions has no application to § 3.1(c) in the text of the Plan, contravenes the express terms of the Plan, and to require such constitutes an abuse of discretion by the Trustees.

D.   Eligibility for Disability Pension

Defendant alternatively asserts that Plaintiff cannot receive the Credit Hours provided by § 3.1(c) "because there has been no determination by the Trustees whether he was eligible for a disability pension during his years missed from work."  Document No. 25 at 24.   However, the § 3.1(c) credit hours are not

conditioned upon a Participant's *eligibility* for Disability Pension, but rather, upon his *ineligibility* for the pension. The Plan explicitly requires a Participant seeking a Disability Pension "to make formal application . . . on forms provided by the Trustees," to submit evidence he has applied for disability benefits under Social Security or the Railroad Retirement Act, to submit himself for an examination if requested to do so by the Trustees, etc., in order to assist the Trustees in determining the "existence of total and permanent disability." Document No. 27 ex. 1 §§ 5.2(d)-(e). Plaintiff, who never claimed or thought himself to be permanently and totally disabled, not surprisingly never made such an application. The Plan language, moreover, provides for no application forms, evidence submissions, examinations, or other procedures to establish that one is *not* totally and permanently disabled. It is rather disingenuous, therefore, for Defendant to argue that the Trustees made no determination "whether he was eligible for a disability pension." No one, including Plaintiff and the Trustees, ever claimed or argued that Plaintiff was eligible for a Disability Pension, and the Plan makes no requirement for and provides no procedure to obtain a *negative* determination of eligibility for a Disability Pension as a predicate for accruing § 3.1(c) Credit Hours.

Defendant's argument cast in its best light, however, may be construed as a challenge to Plaintiff's claim on the grounds that

he failed to exhaust administrative remedies.  Under ERISA, a plaintiff must exhaust administrative remedies before bringing suit to obtain benefits wrongfully denied.  *See* <u>Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.</u>, 215 F.3d 475, 479 (5th Cir. 2000); <u>Hager v. NationsBank N.A.</u>, 167 F.3d 245, 248 n.3 (5th Cir. 1999).  The purpose of the exhaustion requirement is to "provide a clear record of administrative action if litigation should ensue, and to assure that judicial review is made under the arbitrary and capricious standard, not de novo." <u>Hall v. Nat'l Gypsum Co.</u>, 105 F.3d 225, 231 (5th Cir. 1997).  Although a claimant need not exhaust issues or theories, *see* <u>Wolf v. Nat'l Shopmen Pension Fund</u>, 728 F.2d 182, 186 (3d Cir. 1984), he may be precluded from bringing a claim for benefits if the issue or theory underlying his claim relies on evidence not presented before the administrators, *see* <u>Novella v. Westchester County</u>, No. 02 Civ. 2192(MBM), 2004 WL 1752820, at * 6 (S.D.N.Y. Aug. 4, 2004).

It is undisputed that Plaintiff requested and received a determination by the Trustees regarding his eligibility for credit under § 3.1(c), timely appealed the Trustees' decision, and received a final decision denying his application for the credit. Although Plaintiff never applied for Disability Pension, Document No. 25 ex. 1 at 44-45; Document No. 26 ex. 1 at 18, his uncontroverted deposition testimony is that he "spent about three-quarters of [his] appeal trying to explain how [he] was not totally

25

and permanently disabled." Document No. 26 ex. 1 at 26.
Defendant's correspondence with Plaintiff reflects that at least
some "medical documentation" was also provided to the Trustees
before the March 15, 2005, meeting was held. Document No. 1 ex.
1-Q. Nonetheless, instead of ruling on Plaintiff's claimed
ineligibility for Disability Pension, or requesting any additional
information necessary to make such a determination, the Trustees
decided it was not "necessary to make a determination" because they
based their decision to deny Plaintiff the § 3.1(c) Credit Hours
entirely on other grounds. Id. ex. 1-S.

In sum, Defendant declined to rule on Plaintiff's eligibility
or ineligibility for Disability Pension although the issue was
raised and presented at the hearing. Defendant therefore cannot
now rely on Plaintiff's purported failure affirmatively to *request*
a determination that Plaintiff was eligible for a Disability
Pension (which he never believed he was) as a pretense for denying
him § 3.1(c) Credit Hours. Accordingly, the Court concludes that
Plaintiff adequately exhausted his claim by presenting evidence
supporting that he was not permanently and totally disabled and was
therefore qualified for injury credit under § 3.1(c).

## III.  Order

For the foregoing reasons, it is ORDERED that Plaintiff
Richard A. Wasson's Motion for Summary Judgment (Document No. 23)

26

is GRANTED, and it is ADJUDGED that Defendant Maritime Association I.L.A. Pension Fund is liable to Plaintiff for benefits based on his 30 years of Continuous Service under the Plan.  It is further ORDERED that Defendant's Motion for Summary Judgment (Document No. 25) is DENIED.

Remaining for trial is the amount of Plaintiff's damages and reasonable attorneys' fees.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this <u>26th</u> day of June, 2007.


                                    EWING WERLEIN, JR.
                            UNITED STATES DISTRICT JUDGE

27